In re Norman Eugene (Jim) FRENCH.

Bankruptcy No. 91–40108.

United States Bankruptcy Court,
D. South Dakota.

Jan. 3, 1994.

Craig Peyton Gaumer, Asst. U.S. Atty., Sioux Falls, SD, for movant Farmers Home Admin.

J. Bruce Blake, Sioux Falls, SD, for debtor Norman Eugene (Jim) French.

Attorney Rick A. Yarnall, Chapter 12 Trustee, Sioux Falls, SD.

PEDER K. ECKER, Bankruptcy Judge.

The matter before the Court is a Motion to Compel Discovery Under Federal Rules of Bankruptcy Procedure 9014 and 7037 and Federal Rule of Civil Procedure 37 [hereinafter "Motion to Compel Discovery"] filed by Assistant United States Attorney Craig Peyton Gaumer on behalf of the Farmers Home Administration [hereinafter "FmHA"] and responded to by Attorney J. Bruce Blake on behalf of Debtor.

In an earlier attempt to investigate why assets were omitted from Debtor's bankruptcy schedules, FmHA sought to examine Attorney Blake's Certified Legal Assistant [hereinafter "C.L.A."] pursuant to Bankruptcy Rule 2004. FmHA sought the exam after Debtor stated at his own 2004 examination that all information regarding assets had been given to and discussed with the C.L.A. who helped prepare the petition and schedules. The Court determined Bankruptcy Rule 2004 could not be used to conduct that type of specific, targeted investigation, but, rather, discovery should be made utilizing the tools available under the Federal Rules of Civil Procedure. *See In re French*, 145 B.R. 991 (Bankr.D.S.D.1992). Subsequently, FmHA deposed the C.L.A., but she refused to answer several questions deemed protected by the attorney-client privilege. The issue at hand is whether the C.L.A. should be compelled to provide those answers. Following an evidentiary hearing, the Court took the matter under advisement. This letter decision constitutes Findings of Fact and

Conclusions of Law pursuant to Bankruptcy Rule 7052.

## BACKGROUND

In June 1992, FmHA filed a motion to convert this Chapter 12 case to Chapter 7 for fraudulent activity, including the unauthorized pre-petition sale of more than $50,000 worth of cattle pledged to FmHA as collateral.[1] The motion states Debtor deposited the proceeds into a checking account but never listed those deposits as assets on the bankruptcy petition and schedules filed February 12, 1991, specifically, Schedule B–2, which requires a disclosure of money deposited with banking institutions. The motion credits FmHA's persistent questioning as paramount to disclosing the omitted funds and instigating Debtor's subsequent amendment.[2] This persistence was in the form of Debtor's own 2004 examination, which explored how data was gathered in order to complete the petition and schedules. During that June 23, 1992, exam, Debtor first "guessed" that, at the time of filing, he did not have any deposits or money in such institutions, but then immediately responded that the C.L.A., who conducted the "data gathering" interview, was, in fact, told deposits did exist, contrary to Schedule B–2's report of "NONE."[3]

In a continued effort to determine the true nature of the omission, FmHA filed a motion to examine the C.L.A. pursuant to Bankruptcy Rule 2004. An evidentiary hearing was held, and FmHA argued that because Debtor spoke to third parties about the conversation he had with the C.L.A. relative to preparing the petition and schedules, any alleged attorney-client privilege had been waived. Debtor argued that a Bankruptcy Rule 2004 exam was not the appropriate vehicle for such an

---

1. This motion was continued on ten days' notice with an order entered August 17, 1992. The hearing is still pending before the Court.

2. On May 2, 1991, Debtor filed a "Notice of Filing of Amendment to Schedule B–2," wherein the original Schedule B–2 totaled $580,950. The amendment is as follows:

UNENCUMBERED PERSONALTY:

| | |
|---|---|
| Cash on hand in checking account (FmHA claims lien interest which is disputed by debtor) | 41,612.00 |
| AMENDED SCHEDULE B–2 TOTAL | $622,562.00 |

3. The transcript indicates the following discussion regarding the preparation of Schedule B–2:

Q Turning to Number b.: "Deposits of money with banking institutions, savings and loan associations, brokerage houses, credit unions, public utilities companies, landlords and others." Would you have had any deposits of money in those institutions when you filed bankruptcy?
A I guess not.
Q You did not have any money deposited with a banking institution when you filed bankruptcy?
A In my checking account I had some money.
Q Do you recall whether Mrs. Gall asked you any questions about whether you had deposits of money in banking institutions?
A Yes, at that time I knew what it was. I told her what it was.
Q So your testimony is you told Mrs. Gall that you had money in your checking account?
A Yes.
Q And yet under—across from b. it lists "None" as the amount. Is that correct?
A I didn't put it there.

Q But that's what it reads?
A Yes.
Q This is your signature on the last page of these documents?
A Yes.
(Transcript, Bankr.Rule 2004 Examination (June 23, 1992) ¶¶ 15–15 at 11; ¶¶ 1–13 at 12.)
. . . .
Q Now that you've had a chance to review that schedule and think about the questions that Mr. Gaumer has asked you, is there anything that pops into your mind that doesn't appear on that exhibit that you'd like to tell us that should have appeared?
A Well, the only thing, I guess the money should have been put down. I didn't know that.
Q The money that you're referring to is what money?
A The 41,000 in my checking account.
Q Are you testifying that you told Mrs. Gall that there was that kind of money in the—in the checking account when you went through this process with her of asking you questions and you answering them?
A Yes. It was told—I wasn't hiding anything. I didn't know but what it was—I didn't know. I just told what was in my checking account. That's what would be left after the checks would come back in.
Q You took the time then to calculate how much money you had in your checking account prior to filing and deducting from them those outstanding checks to come up with a final figure?
A I knew it was around 41,000.
Q And you told Mrs. Gall that—
A Yes.
(*Id.* ¶¶ 1–16 at 16; ¶¶ 1–15 at 17.)

investigation. The Court issued its letter decision denying the motion, inasmuch as a Bankruptcy Rule 2004 examination is designed to discover issues of general interest concerning the overall administration of the bankruptcy case, not for completing discovery in preparation of pending litigation. *In re French,* 145 B.R. at 992, 993.[4]

With that lead, FmHA filed a Notice of Deposition Under Federal Rule of Civil Procedure 30(a) and Federal Rule of Bankruptcy Procedure 9014 of Joyce P. Gall and, on the same date, September 28, 1992, issued a subpoena to depose the C.L.A., commanding her to produce and permit inspection and copying of "[a]ny and all documents in her possession or control used to prepare Norman Eugene (Jim) French's Chapter 12 Bankruptcy Petition and Schedules." On October 30, 1992,

Debtor moved to quash the subpoena,[5] and FmHA filed a resistance thereto,[6] but before the motion was brought before the Court, the C.L.A.'s deposition had been completed.[7] At the November 23, 1992, deposition, Attorney Blake instructed the C.L.A. not to answer questions relating to that initial "data gathering" interview.[8]

One week after the C.L.A.'s deposition, November 29, 1992, Debtor filed an "Affidavit and Claim of Client's Privilege on Confidential Communication with Lawyer," stating that, "during the course of the preparation of and administration of his case," he made confidential communications to both Attorney Blake and the C.L.A. and that he was invoking the attorney-client privilege pursuant to S.D.C.L. § 19–13–3,[9] specifically instructing

---

4. The Court stated, "In general, the Court believes that, for ethical considerations, there is something repugnant in requiring an attorney to submit to a Rule 2004 examination, especially when debtor's counsel is the sought-after target. The Court believes that a C.L.A. is an extension of debtor's counsel. Allowing debtor's counsel to be subject to this rule is simply going too far, is contrary to the Rules of Professional Conduct, and would quickly erode attorney-client relationships." *Id.* at 993.

5. The motion was based on Federal Rule of Civil Procedure 45(c)(3)(A)(iii), which states the Bankruptcy Court "shall quash or modify the subpoena if it requires disclosure of privileged or other protected matter and no exception or waiver applies."

6. FmHA made a four-part argument resisting the Motion to Quash:
 1) South Dakota law does not govern the privileges available to litigants in federal court;
 2) under applicable federal law, the information sought by the government is not subject to the attorney-client privilege because it is not now and never has been confidential information;
 3) even if the information was somehow subject to the attorney-client privilege, the debtor has waived his right to assert the attorney-client privilege by discussing the preparation of his schedules with third parties and
 4) Mrs. Gall is entitled to answer questions concerning the manner in which she completed the debtor's petitions and schedules in order to defend herself from charges of wrongful conduct made by the debtor.

7. The Motion to Quash was brought before the Court September 23, 1993, but the matter was

moot since the deposition had been taken nearly one year earlier.

8. Attorney Blake instructed the C.L.A. to refuse answers to the following questions:
 Q. If you had been aware that the debtor had money in a bank account, would you have told Mrs. Tupy to type that information into these petitions and schedules?
 Q. Mrs. Gall, are you aware of whether Mr. French had any money in the bank—are you now aware whether Mr. French had any money in the bank at the time these petitions and schedules were filled out?
 Q. Mrs. Gall, did Mr. French tell you during the first interview or at any time prior to the time these petitions and schedules were filled out, that he had money in a bank account?
 Q. Mrs. Gall, if Mr. French had told you that he had 40,000 dollars in his bank account on the date the petition [and] schedules were filed, would you have told Mrs. Tupy to include that?
 Q. Mrs. Gall, was Mr. French's statement under oath [at the] 2004 Exam true when he said he told you all about the money in his checking account?

9. This section provides:
 A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client
 (1) between himself or his representative and his lawyer or his lawyer's representative,
 (2) between his lawyer and the lawyer's representative
 . . . .
 S.D.C.L. § 19–13–3. This text follows Proposed Federal Rule of Evidence 503(b). *See infra* n. 13 & accompanying text.

the C.L.A. to refuse answers to questions regarding such confidential communications.

On January 27, 1993, FmHA filed the Motion to Compel Discovery and a brief in support of the motion. Debtor filed a response March 4, 1993. On March 25, 1993, Debtor was criminally indicted by a grand jury for numerous counts of bankruptcy fraud.[10] After several rescheduled hearings, an evidentiary hearing was held September 23, 1993, at which time, the Court took the matter under advisement.

## DISCUSSION

In general, evidentiary rules promote ascertaining the truth, yet some of these rules exclude the truth by shielding the revelation of confidential communications made between certain "privileged" relations. One of the oldest forms of this common law privilege is the relationship between an attorney and client. Federal Rule of Evidence 501 is the protective device that recognizes the need for a client to confide with his attorney and strives to protect that relationship by encouraging "full and frank communication between attorneys and their clients and thereby promot[ing] broader public interests in the observance of law and administration of justice." *In re Hunt*, 153 B.R. 445, 450 (Bankr.N.D.Tex.1992), *citing Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The encouragement is the prerogative to refuse disclosing and the power to prevent others from disclosing confidential communications made:

for the purpose of facilitating the rendition of professional legal services to the client,

1) between himself or his representative and his lawyer or his lawyer's representative;

2) or between his lawyer and the lawyer's representative;

3) or by him or his lawyer to a lawyer representing another in a matter of common interest;

4) or between representatives of the client or between the client and a representative of the client;

5) or between lawyers representing the client.

*U.S. v. White*, 950 F.2d 426, 430 (7th Cir. 1991); 8 J. Wigmore, *Evidence* § 2292 (McNaughton rev. 1961); *see also* Proposed Federal Rule of Evidence 503(a)(b). Rule 501 is intended to safeguard privileged *communications*, not to conceal mere facts communicated; therefore, the fact that a client has discussed a matter with an attorney does not by and of itself insulate the client against disclosing the subject matter discussed, only the discussion itself is privileged. McCormick on Evidence § 93; *Sedco Intern., S.A. v. Cory*, 683 F.2d 1201, 1205 (8th Cir.1982), *citing Upjohn Co. v. United States*, 449 U.S. at 395–96, 101 S.Ct. at 685–86. Ensuring the sanctity of open, honest communication is the purpose of this specific evidentiary rule.

In federal criminal and civil cases where federal law provides the rule of decision, the privilege is governed by the courts of the United States.[11] Fed.R.Evid. 501. Federal Rule of Evidence 501 applies to all states of all actions and proceedings, including bankruptcy court actions such as a Bankruptcy Rule 2004 examination.[12] Fed.

10. Count 33 of the indictment states:

On or about March 27, 1991, in the District of South Dakota, Defendant Norman Eugene French, a/k/a Jim French, knowingly and fraudulently made a false oath and account in and in relation to his bankruptcy case In Re: Norman Eugene French, Case No. 91–40108, under Title 11 of the United States Code by executing as true and correct under penalty of perjury and filing with the Bankruptcy Court his Schedule B–2 "Personal Property," which represented under oath that he had no money in a checking account, when in fact the Defendant Norman Eugene French, a/k/a Jim French, knew he had over $40,000.00 in a checking account.

Debtor was subsequently convicted on all criminal counts; therefore, resolving the question at hand will no longer affect or impact those proceedings.

11. In civil actions and proceedings where state law provides the rule of decision, Rule 501 provides that the privilege will be governed according to state law.

12. A Bankruptcy Rule 2004 examination, derived from former Bankruptcy Rule 205, is a proceeding in bankruptcy. *Citibank, N.A. v. Andros*, 666 F.2d 1192, 1194 n. 5 (8th Cir.1981). *See* 12 *Collier on Bankruptcy* ¶ 205.01, at 2–75 (14th ed. 1978); *see also* The Advisory Committee Note to Bankruptcy Rule 2004.

R.Evid. 1101(c). Because privileges contravene the public's "right to know," privileges should be strictly construed and "accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel v. United States,* 445 U.S. 40, 47–50, 100 S.Ct. 906, 910–12, 63 L.Ed.2d 186 (1980). Despite this warning, the law of privilege has been allowed to develop with some degree of flexibility, inasmuch as the Supreme Court's Proposed Rules of Evidence and accompanying Advisory Committee Notes were not enacted by Congress, presumably, so that the law would develop "in the light of reason and experience" on a case-by-case basis. *Citibank, N.A. v. Andros,* 666 F.2d 1192, 1195 n. 6 (8th Cir.1981). Nonetheless, the proposed rules are still regarded by the courts as an authoritative source of the principles of the common law.[13] *Id.*

 Privileges are invoked and waived by the client who holds the privilege or by the attorney on behalf of the client. *Hollins v. Powell,* 773 F.2d 191, 196 (8th Cir.1985); Hon. Barry Russell, *Bankruptcy Evidence Manual* § 501.1, at 252 (1993 ed.). The individual who asserts the privilege must also satisfy the burden of establishing the *right* to invoke the privilege and to show facts which give rise to the privilege—facts, not just mere assertions—that the privilege exists. *Hollins v. Powell,* 773 F.2d at 196; *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 609 (8th Cir.1978); *Bouschor v. United States,* 316 F.2d 451, 456 (8th Cir.1963). If successfully invoked, a privilege may be waived either expressly or by implication. *Hollins v. Powell,* 773 F.2d at 196; *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974); *United States v. Cote,* 456 F.2d 142, 144 (8th Cir.1972). Waiver is express, for example, when the holder destroys the privilege by voluntarily disclosing or consenting to disclose any significant part of the matter or the communication. Proposed Federal Rule of Evidence 511; McCormick on Evidence §§ 87, 97, 106; 8 J. Wigmore, *Evidence* §§ 2242, 2327–29, 2374, 2389–90 (McNaughton rev. 1961). Waiver is implied, for example, when a client testifies concerning portions of the attorney-client communication. *Hollins v. Powell,* 773 F.2d at 196. Waiver may also be implied when a client attacks his attorney's conduct by calling into question the substance of the communication(s). *Tasby v. United States,* 504 F.2d at 336.

In *Tasby,* a client appealed his conviction of making a false material declaration—a prosecution that arose from two prior proceedings: the first, during Tasby's kidnapping trial, wherein he chose to testify on his own behalf (after making a record which established the fact his attorney advised him not to take the stand); and, the second, during Tasby's subsequent claim of ineffective assistance of counsel, wherein he argued his testimony at trial had been coerced when his attorney indicated that, without his testimony, he would be sentenced anywhere from 25 years to life in prison. *Id.* at 334. On appeal, the Eighth Circuit Court of Appeals held:

> One of the circumstances which may support a conclusion of a waiver is an attack by the client upon his attorney's conduct which calls into question the substance of their communications. A client has a privilege to keep his conversations with his attorney confidential, but that privilege is waived when a client attacks his attorney's competence in giving legal advice, puts in issue that advice and ascribes a course of action to his attorney that raises the specter of ineffectiveness or incompetence. Here, the confidentiality of the attorney-client relationship was breached by Tasby. Surely a client is not free to make various

---

**13.** The proposed rules are also an authoritative source for legislatures, as well. For example, South Dakota has enacted several proposed texts: "A person upon whom this chapter confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclose any significant part of the privileged matter. This section does not apply if the disclosure itself is privileged." S.D.C.L. § 19–13–26; Proposed Federal Rule of Evidence 511; *see also* S.D.C.L. § 19–13–3 and Proposed Federal Rule of Evidence 503(b).

allegations of misconduct and incompetence while the attorney's lips are sealed by invocation of the attorney-client privilege. Such an incongruous result would be inconsistent with the object and purpose of the attorney-client privilege and a patent perversion of the rule. When a client calls into public question the competence of his attorney, the privilege is waived.

*Id.* at 336 (citations omitted). This case illustrates the careful balance Rule 501 must strike with respect to the truth and how spontaneously an appropriate waiver will tip the balance in favor of revealing previously guarded truth. It is an equilibrium unaffected by the distinctively separate ethical rule of confidentiality that may also exist, which means that:

> [A] lawyer may reveal otherwise privileged communications from his clients in order to ... defend himself against charges of improper conduct, without violating the ethical rules of confidentiality or the attorney-client privilege ... The privilege for communications between client and attorney ceases when the purpose of the privilege is abused, when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act.

*United States v. Ballard,* 779 F.2d 287, 292 (5th Cir.1986); *Tasby v. United States,* 504 F.2d at 336.

Sometimes, the issue of waiver is raised only to determine no privilege ever really existed—and whether a privilege exists is a matter for the court to decide. Fed.R.Evid. 104(a). In *U.S. v. White,* debtors Richard and Judith White were convicted of bankruptcy fraud following a one-count indictment charging that they failed to disclose various assets in their bankruptcy petition. *U.S. v. White,* 879 F.2d 1509, 1510–11 (7th Cir.1989); *see also U.S. v. White,* 970 F.2d 328, 332–33 (7th Cir.1992).[14] One of the key issues was whether the Whites had, in fact, provided information about the undisclosed assets to their attorney (in which case, he might be complicit in the fraud) or whether there was some legal reason for omitting the assets from the schedules. *U.S. v. White,* 950 F.2d at 429. The Whites' attorney stated his paralegal probably collected the information contained in the bankruptcy schedules and that he probably reviewed the schedules after they were completed. *Id.* Following general discussions regarding standard procedures for handling bankruptcy cases, and after acknowledging no waiver had been obtained regarding confidential information, and after contemplating what was and was not considered confidential, the attorney returned to his former law firm and reviewed and gave copies of documents from the Whites' file to the government—these included drafts of the bankruptcy petition and interview notes used to prepare the drafts. *Id.* at 431. The district court found that the information in the documents was not privileged. *Id.* at 430. The Seventh Circuit Court of Appeals relied on its previous decision, *United States v. Lawless,* 709 F.2d 485 (7th Cir.1983),[15] and held:

> When information is disclosed for the purpose of assembly into a bankruptcy petition and supporting schedules, there is no intent for the information to be held in confidence because the information is to be disclosed on documents publicly filed with the bankruptcy court.... "information imparted to counsel without any expectation of confidentiality is not privileged."

*U.S. v. White,* 950 F.2d at 430, *citing In re Feldberg,* 862 F.2d 622, 628 (7th Cir.1988).

## DECISION

■ In this case, FmHA seeks to ascertain the truth about a potential concealment of assets at the time this bankruptcy petition was filed. The wellspring for this sought-after truth is the initial interview between

---

**14.** In this case, Richard White's brother, Daniel, was convicted of bankruptcy fraud for concealing various assets, and the issue of attorney-client privilege was also raised—both brothers were represented by the same attorney. *U.S. v. White,* 970 F.2d at 330.

**15.** In *Lawless,* information transmitted between a client and attorney was somehow omitted from an estate tax return, to which the court held, "[W]hen information is transmitted to an attorney with the intent that the information will be transmitted to a third party ... such information is not confidential ... if the client transmitted the information so that it might be used on the tax return, such a transmission destroys any expectation of confidentiality which might have otherwise existed." *United States v. Lawless,* 709 F.2d at 487.

Debtor and the C.L.A. which was conducted in order to obtain information necessary to compile the bankruptcy petition and schedules, in particular, Schedule B–2. The C.L.A., as a direct extension and representative of Debtor's attorney, constitutes a viable form of the attorney-client relationship, so that, in general, Debtor's communications with the C.L.A. would be subject to protection. *If* a privilege exists, the source of protection would be Federal Rule of Evidence 501, and Debtor would bear the burden of proving the right to invoke the privilege and the burden of showing specific facts giving rise to the privilege.

Debtor did, indeed, file an affidavit claiming the privilege, but the timing was off, and, even then, it was in the form of a "blanket" assertion rather than articulating specific facts giving rise to a privilege. The affidavit was filed in November 1992, some five months after a substantial portion of the communication had been disclosed at Debtor's own Bankruptcy Rule 2004 examination, a bankruptcy proceeding subject to Rule 501. Debtor or Attorney Blake could have and should have invoked the privilege at that time. This was not done. Instead, Debtor voluntarily disclosed that the C.L.A. was provided information regarding the existence of money in financial institutions at the time of the filing, yet Schedule B–2 failed to list the $41,612 cash on hand as an asset. This disclosure not only destroyed all allegations of privilege, but it attacked Attorney Blake's ability to properly compile the bankruptcy petition and schedules. And like the situation in *Tasby*, Attorney Blake is entitled to defend the charge of incompetence without running into any separate ethical duty concerning confidentiality.

■ But more to the point is whether the Court even recognizes that a privilege exists in this case. It does not. It is rare that this Court would condone disclosing any conversations between a client and his attorney, but, in bankruptcy, debtors are obligated to disclose all assets and liabilities as part of an honest financial reorganization. The initial interview that took place in this case was simply a way of identifying financial facts— debts and assets—similar to a plaintiff reciting facts to constitute a publicly filed complaint against a particular defendant. In bankruptcy, a debtor's assets and liabilities are the financial facts that constitute the publicly filed petition for relief. That kind of disclosure is not the same as a client who seeks and obtains professional bankruptcy counseling like how to maximize assets through pre-petition planning or what strategies might be used to restructure existing debt. The *White* decision is key in this case. There is no expectation that information disclosed for the purpose of assembling a bankruptcy petition and supporting schedules will be held confidential.

Federal Rule of Evidence 501 safeguards confidential communications between privileged relations. The result in this case does not alter or chill that goal. Following a strict construction of the rule, there can be no "public good transcended" by designating this particular information privileged. Quite the opposite. Bankruptcy offers relief for the honest debtor, and, in that regard, there is simply no need to turn to the law of privilege as a means of ensuring "full and frank" disclosure between a debtor and his attorney, at least when it comes to preparing bankruptcy petitions and schedules. Granting the Motion to Compel Discovery is a rational way of ascertaining the truth and promotes the broader public interest in observing the law. The Court shall enter an appropriate order.